UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                  CRIMINAL NO. 16-20556

v.                                HON. JUDITH E. LEVY

TONY CHRISTOPHER BURGER,

      Defendant.

---

## United States' Response Opposing the Defendant's Motion for Compassionate Release

---

At his sentencing in 2018, Tony Burger faced a sentencing guideline range of life, capped at the statutory maximum of 360 months for production of child pornography. During allocution, Burger told the Court that he knew that he needed professional help, and that he planned "to get the help that I need with the sex offender programs." (Sentencing Transcript, ECF No. 57, PageID 732.) Burger's attorney echoed his client, and asked the Court to "recommend that the Bureau of Prisons place Mr. Burger in a facility with a sex offender and substance abuse treatment

program." (*Id.*, PageID 719.) The Court sentenced Burger to 186 months, six months over the mandatory minimum.

Once Burger arrived at BOP, however, he declined "any interest in [sex offender treatment] programming." (Exhibit A, BOP Records, BURGER_0143, *submitted under seal.*) He has not participated in any treatment to date, and he is not on the waitlist for future programming. Burger's earliest release date, with credit for good time, is October 19, 2029. Burger has now moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Burger does not qualify for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Although Burger has several medical conditions, including cerebral palsy and Graves' disease (hypothyroidism), none of his conditions place him at increased risk of severe illness from the virus that causes Covid-19, according to the Centers for Disease Control and Prevention. *See* CDC: People with Certain Medical Conditions.

Compassionate release is also not appropriate for Burger because he is a danger to the community, and his release is precluded under USSG § 1B1.13(2). And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because Burger committed unquestionably serious offenses against children, and he has served only a small fraction of the sentence imposed by the Court.

In his motion for compassionate release, Burger claims that FCI Milan, where he is serving his sentence, has "one of the most significant COVID-19 outbreaks in the federal Bureau of Prisons." This is no longer true; right now, Milan has no active Covid-19 infections among inmates. *See* [BOP Covid-19 Website](); *see also United States v. Dixson*, No. 19-20305 (E.D. Mich. September 5, 2020) (Goldsmith, J.); *United States v. Adams*, No. 17-20598 (E.D. Mich. October 2, 2020) (Hood, J.); *United States v. Alderson*, No. 18-20348 (E.D. Mich. August 13, 2020) (Cleland, J.); *United States v. Sorrell,* No. 13-20764 (E.D. Mich. August 12, 2020) (Borman, J.) ("These statistics support the reality that the BOP has acted responsibly in dealing with the COVID-19 pandemic at FCI-Milan").

## Background

For years, Tony Burger searched for young girls online. He frequented sites and applications used by pre-teens, like musical.ly (the predecessor to TikTok), chateen.com, Kik, Skype, and mylol.com. Burger befriended and seduced young girls by pretending to be a 14 year-old boy named Tony Matt Jones. But Burger wasn't 14; he was solidly in his thirties. Burger sent the preteen girls he met online photographs of a teenage boy in the Philippines, and pretended to be this minor boy. Burger asked his victims to take explicit photographs, and they complied.

Burger's total number of victims is unknown. During the course of the 2016 investigation, the FBI positively identified four minor victims. MV-1 and MV-2 were only 10 years old when Burger exploited them, while MV-3 was 12 years old. And Burger began exploiting MV-4 five years earlier, in 2011, when she was 13 years old. But a witness said that Burger told him he'd been in chat rooms since 1998, and had been looking for young kids online since 2006. Burger also told this witness that he had communicated with over 50 girls and boys online using his 14 year-old persona, and that he had received over one million pictures and videos from his victims. Burger also told the witness that he was going to play

"the crazy role in court," act like he did not know what he was doing was wrong, and say that he felt as young as the girls that he was communicating with online.

At the time of his sentencing, Burger presented the court with a psychosexual evaluation from Dennis Sugrue. (Defendant's Motion for Compassionate Release, Exhibit 2.) It is clear that Burger minimized his conduct when he was interviewed by Dr. Sugrue. For example, Burger told Dr. Sugrue that "only MV-1 sent him pictures" and that "he only chatted with the other minors." (Def. Ex. 2, p. 8.) This is demonstrably false; Burger also requested and received child pornography from MV-2, MV-3, and MV-4, at the very least. Burger also claimed that he continued communicating with the minors because "walk[ing] away . . . would have made them sad." (*Id*.) In reality, Burger groomed and manipulated his minor victims, and introduced them to sexual activity. Although he denied the scope of his conduct to Dr. Sugrue, Burger's text messages make clear that he was an expert in the sexual exploitation of preteens. For example, Burger had the following exchange with 10 year-old MV-1:

|  |  |
|---|---|
| Burger: | i miss u |
| | i feel sad bc we are not talking |
| MV-1: | miss u plz do t be |
| Burger: | i want to cry |

```
                    bc I feel like i got u in trouble for having skype
                    i don't want to lose u
MV-1:               no u didint I'm just to young. But next year. Babe
                    u won't
                    she said i am
                    but I'm not
Burger:             can't u download it each day and delete it when
                    we are done talking
```

Even though MV-1's parents did not let her to use Skype, Burger explained to her how she could download and delete the application every day. She followed his advice. On Skype, Burger's conversations with MV-1 were explicit. He told her he wanted to see her "pussy" and she sent him a photograph depicting her genitals. (PSR ¶17.) He directed her to "open legs more," and she sent him another photograph. (*Id*.) He told her he was "so hard," and she asked him what that meant. (*Id.*) Burger directed MV-1 to engage in sex acts:

```
Burger:             I need to find some videos to show u how to
                    touch your self and finger your pussy
MV-1:               okay go do that
Burger:             u want me too
MV-1:               sure
Burger:             will it help you
MV-1:               Yes
Burger:             Im the only boy has seen your pussy
MV-1:               well [my] dad has when I was a baby
MV-1:               But [as] my bf yes
. . .
Burger:             Im so hard still
MV-1:               What so hard
```

| Burger: | My dick |
| MV-1: | that was my guess in my head |

Burger's conversations with MV-2, age 10, also demonstrate his proficiency at breaking down children's barriers online:

| Burger: | My dicks so hard baby |
| MV-2: | that a good thing? |
| Burger: | Yes it is |
| MV-2: | Really? |
| Burger: | Yes im hard as a rock my love |
| MV-2: | Ur different |
| Burger: | I'm thinking about u sucking it |
| MV-2: | Wow |
| | I think of kissing you |
| Burger: | I want to rub between your legs |
| MV-2: | . . . |
| Burger: | Then I start to rub then slide one finger in u |
| MV-2: | There is nothing UNATRUAL going in my body WAIT WHO SAIF ANYONE WAS HAVING THAT WITH ME? |
| Burger: | I think you want me to teach u how to be naught |
| MV-2: | No |
| | No |
| | No |
| | No |
| Burger: | Not right now |
| MV-2: | No |
| | No |
| | Never |
| | Neber |
| | Never |
| Burger: | Ok beautiful |
| MV-2: | Thank u |
| | Ur different |

Eventually, MV-2 sent a picture of her genitals to Burger in response to his repeated requests. She thought Burger was her boyfriend. When MV-2 tried to cut off contact with Burger, he threatened to post her pictures online.

With MV-3, Burger escalated his demands overtime, eventually requesting that she engage in sexual activity with her dog and minor cousin:

| | |
|---|---|
| Burger: | can puppy lick |
| MV-3: | She won't |
| Burger: | you ready |
| | You need peanit butter |
| Burger: | cosdsin make him lick |
| MV-3: | I need to get ready for today |
| Burger: | Take off |
| MV-3: | Which one first? |
| Burger: | shirt |
| MV-3: | u alone |
| Burger: | yes |
| | Rub on bra |
| | Shorts |
| | Get cousin to lick u |
| . . . . | |
| Burger: | rub on him |
| | rub on his underwear |
| | ask him to let u touch his underwear |
| | to shy |
| | let him lick yoir pussy |
| | we been naughty all night |
| | what your favitit dress or outfit |
| MV-3: | want bra off |
| Burger: | he like that ass |

> rub your ass on hios dick he will get hard
> tell him to put his arms arounbd you
> rub that ass on his dick
> twell him let it get hard
> you both like
> kiss him :)
> thast was great

The investigation also determined that Burger sent child pornography of MV-3 to a trading partner in Australia. Burger chatted with the Australian suspect. The Australian suspect asked Burger if MV-3 and her cousin would "go farther," and Burger responded: "I'm working on it."

Burger's chats directly contradict what he told Dr. Sugrue. Even so, Dr. Sugrue concluded that Burger presented a *moderate/high* risk to reoffend. (Def. Ex. 2, p. 3.) Dr. Sugrue went on to note: "without intervention and supervision, there is a notable risk of repeat solicitation offending, illegal substance abuse, and probation breeches." (*Id.*)

## Argument

## I.   The Court should deny Burger's motion for compassionate release.

Burger's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009).

Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36. Here, Burger sent a request for compassionate release to the warden on July 27, 2020. (Ex. A, BURGER_0141.) On August 27, 2020, Burger's request was denied. (BURGER_0142.) Accordingly, Burger has properly exhausted his administrative remedies.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.   Burger is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13, because he does not have "extraordinary and compelling reasons."

Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t). The compassionate-release statute thus permits a sentence reduction only when "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

Because the Sentencing Commission fulfilled Congress's directive in USSG § 1B1.13, compliance with that policy statement is mandatory for any defendant seeking compassionate release under § 3582(c)(1)(A). The Supreme Court has already reached the same conclusion for compliance with USSG § 1B1.10 under 18 U.S.C. § 3582(c)(2), based on the statutory language there. *Dillon v. United States*, 560 U.S. 817, 827 (2010). And the statutory language in § 3582(c)(1)(A) is identical to the language in § 3582(c)(2). *Compare* § 3582(c)(1)(A) (requiring that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"), *with* § 3582(c)(2) (same). When Congress uses

the same language in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014) (citing *Dillon*, 560 U.S. 817); *accord United States v. Saldana*, 807 F. App'x 816, 819–20 (10th Cir. 2020).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *Saldana*, 807 F. App'x at 819–20. Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Burger and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

In his motion, Burger asserts that he has the following medical conditions: cerebral palsy, cognitive limitations, depression, psychosis, Graves' disease, and hypothyroidism. (ECF 54, PageID 261.) Burger's PSR and BOP medical records confirm that he has cerebral palsy, hearing loss, and hypothyroidism. (Exhibit A, BURGER_0001-0134; PSR ¶ 79.) But none of these medical conditions are recognized by the CDC as a risk factor for complications from Covid-19.

Burger also has a mental health history that includes depression and psychosis. (BURGER_0001-0134; PSR ¶ 80.) But mental health

diagnoses are not Covid-19 risk factors. In his motion, Burger argues that his diminished capacity could interfere with his ability to provide self-care. But Burger does not appear to have any significant impairments, and a competency evaluation in November 2016 noted that Burger had "been observed interacting in a socially appropriate manner with others." (Exhibit B, p. 9, 2016 BOP Competency Evaluation, *submitted under seal*.) The evaluation found that he had a "Mild Intellectual Disability," and that such a condition "typically . . . remains stable over time." (*Id.,* p. 8.) Burger is able to "attend to his activities of daily living, to include personal hygiene, managing finances, and cleaning." (*Id.*) Finally, the evaluation concluded that Burger's claim of hearing voices was "likely malingering psychological symptoms . . . motivated by external incentives." (*Id.*)

None of the medical conditions identified in Burger's motion for compassionate release place him at a higher risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated) (identifying the confirmed medical conditions that increase someone's risk from Covid-19). So whether considered alone or in combination with the Covid-19 pandemic, Burger's age (38) and medical conditions do not satisfy the initial

eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020).

> **B.    Burger is not eligible for compassionate release because he is a danger to the community.**

Burger also remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." As with the other requirements in § 1B1.13, this prohibition on releasing dangerous defendants applies to *anyone* seeking compassionate release. 18 U.S.C. § 3582(c)(1)(A) (requiring that release be "consistent with" § 1B1.13); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (confirming that a released defendant must "not represent a danger to the safety of any other person or the community"). Although a court must also evaluate the defendant's dangerousness when balancing the § 3553(a) factors, dangerousness alone is a per se bar to release under USSG § 1B1.13(2). *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020); *United States v. Oliver*, No. 2:17-cr-20489, 2020 WL 2768852, at *7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which § 1B1.13(2) references for its dangerousness determination—requires a comprehensive view of community safety, "a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). Indeed, even when considering *pretrial* detention under § 3142(g), "[t]he concept of a defendant's dangerousness encompasses more than merely the danger of harm involving physical violence." *United States v. Williams*, No. 20-1413, 2020 WL 4000854, at *1 (6th Cir. July 15, 2020) (citing *United States v. Vance*, 851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more strongly post-judgment, when the defendant's presumption of innocence has been displaced by a guilty plea or jury's verdict and when "the principle of finality" becomes "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the release of violent offenders. It bars the release of most drug dealers, "even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to

the community."); *Knight*, 2020 WL 3055987, at *3. It bars the release of defendants whose offenses involved minor victims or child pornography. *See United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *3 (6th Cir. July 8, 2020). It also bars the release of many "non-violent" offenders, such as defendants who were involved in serial or significant fraud schemes or otherwise present a danger to the community in some respect.

As relevant here, "federal courts have been disinclined to grant compassionate release to petitioners convicted of crimes involving child pornography, even for vulnerable petitioners during the COVID-19 pandemic, citing potential dangerousness." *Coleman v. United States*, No. 4:17-CR-69, 2020 WL 3039123, at *4 (E.D. Va. June 4, 2020); *see also States v. Ciccone*, 2020 WL 1861653, at *3 (N.D. Ohio Apr. 14, 2020). Courts are particularly disinclined to release inmates to the place where they committed the offense or without a detailed plan to prevent reoffending. *See, e.g.*, *United States v. Mitchell*, 2020 WL 2770070, at *4 (E.D. Cal. May 28, 2020) (denying compassionate release where the inmate proposed returning to the same home where he committed the crime without a plan to prevent reoffending); *United States v. Feiling*, 2020 WL 1821457, at *8 (E.D. Va. Apr. 10, 2020) (denying compassionate

release in part because the inmate wanted to return to the home where he committed his offense); *United States v. Hylander*, 2020 WL 1915950, at *3 (S.D. Fla. Apr. 20, 2020) (denying a motion for compassionate release because the inmate proposed returning to the location of his offense). And "given the ease with which child pornography is accessible in the modern world," releasing such offenders "is likely to require stringent and frequent monitoring," which creates a safety risk for the officers tasked with that responsibility during a health pandemic. *United States v. Sears*, 2020 WL 3250717, at *3 (D.D.C. June 16, 2020); *see also United States v. Meizin*, 2020 WL 1985042, at *5 (N.D. Ohio Apr. 27, 2020) (denying compassionate release because of the easy access to electronic devices).

In addition, Burger remains dangerous because he has not participated in sex offender treatment or substance abuse treatment. Even though he told the Court at sentencing that he wanted professional help, and even though Dr. Sugrue's evaluation strongly recommended both types of treatment, when Burger arrived at the BOP he did not sign an agreement to participate in sex offender treatment. When presented with the form, Burger told the psychology staff that he was "no longer

interested" in sex offender treatment. (Exhibit A, BOP Records, BURGER_0143.) At present, Burger is not even on the waitlist for the BOP's comprehensive sex offender treatment program. And Burger has also failed to participate in substance abuse treatment with the BOP. (BURGER_0136.)

At Burger's June 2018 sentencing, the Court explained:

> In terms of protecting the public from further crimes, I believe that at this point you are a danger to society. It is my hope that you can be rehabilitated. That with punishment, with treatment, with an opportunity for oversight with supervised release, that you will never hurt another person.
> But I think at this point until you have that treatment, until you fully understand and accept the harm you've inflicted on these children, that you are a danger to society. And this is a crime that can take place on a telephone sitting on a park bench. It doesn't require any contact with anyone. But the harm is a horrible and lasting harm. It doesn't require physically assaulting a child and raping a child for a child to suffer that terrible fear of members of the public, both friends and strangers.

ECF 57, PgID 736-737.

A little over two years ago, the Court found that Burger was dangerous. Little has changed in two years. Burger has not participated in any treatment to address his sexual interest in children or substance abuse problem. He remains dangerous. As such, he is not eligible for release. USSG § 1B1.13(2).

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Burger eligible for compassionate release, the § 3553(a) factors should still disqualify him.

At sentencing, when evaluating the 3553(a) factors, the Court described Burger's offense as "horrific." (ECF 57, PageID 733.) The Court noted the "cruel and calculated way" that Burger "coerced these children into engaging in sex acts solely for [his] own personal gratification and perhaps even to share with others." (*Id.*) The Court was also confident that Burger knew that he "was tricking children into believing [he was] a 14-year-old." (*Id.*) The Court concluded that "obviously a significant custodial sentence is warranted as punishment." (*Id.*, at 735.)

Burger has served a little over 25% of the sentence imposed by this Court. (BURGER_0140.) The 3553(a) factors weigh strongly against releasing him now.

## II.   MV-1's family opposes Burger's motion

The Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, guarantees victims in criminal cases specific rights that are enforceable in federal court. Congress enacted the CVRA in order "to protect victims and guarantee them some involvement in the criminal justice process." *United States v. Moussaoui*, 483 F.3d 220, 234 (4th Cir. 2007). One of the rights enumerated in the CVRA is "the right to be reasonably heard at

any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding." 18 U.S.C. § 3771(a)(4).

MV-1's father strongly opposes Burger's motion for compassionate release. He prepared a victim impact statement in response to Burger's motion for compassionate release. In it, he begs the Court "to deny this motion and make the defendant serve the sentence that was given to him." (Exhibit C, Victim Impact Statement, *submitted under seal*.)

### III.   If the Court were to grant Burger's motion, it should stay the release order pending any appeal by the United States.

If the Court were inclined to grant Burger's motion, despite the government's arguments above, the government would request that the Court's release order include two provisions. First, the Court should order that he be subjected to a 14-day quarantine before release. Second, the Court should stay its order pending any appeal by the government to the Sixth Circuit. More specifically, the government would request that if the government files a notice of appeal before the 14-day quarantine ends, the Court's order would automatically be stayed through the completion of any appeal proceedings.

## Conclusion

Burger's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER,
United States Attorney

<u>s/Sara D. Woodward</u>
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9180
E-Mail: sara.woodward@usdoj.gov

Dated: October 13, 2020

**Certificate of Service**

I hereby certify that on October 13, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s/ Sara D. Woodward
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9810
sara.woodward@usdoj.gov

October 13, 2020